## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MARTIN COUNTY, FLORIDA<br>2401 SE Monterey Road<br>Stuart, FL 34966<br><br>THOMAS L. HEWITT<br>139 Commodore Drive<br>Jupiter, FL 33477<br><br>V. MICHAEL FERDINANDI<br>1643 Hermitage Circle<br>Frenchman's Reserve<br>Palm Beach Gardens, FL 33410<br><br>    *Plaintiffs*,<br><br>  v.<br><br>U.S. DEPT. OF TRANSPORTATION<br>1200 New Jersey Avenue SE<br>Washington, DC 20590<br><br>ANTHONY R. FOXX,<br>in his official capacity as Secretary of Transportation<br>1200 New Jersey Avenue SE<br>Washington, DC 20590<br><br>PETER M. ROGOFF,<br>in his official capacity as Under Secretary of<br>Transportation for Policy<br>1200 New Jersey Avenue SE<br>Washington, DC 20590<br><br>    *Defendants*. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) Civil Action No. 15-632<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

### COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

Plaintiffs Martin County, Florida ("Martin County"), Thomas L. Hewitt, and V. Michael

Ferdinandi (collectively, "Plaintiffs"), through their undersigned counsel, hereby file this

complaint for declaratory and injunctive relief against (1) Defendant United States Department

1

of Transportation; (2) Defendant Anthony R. Foxx, in his official capacity as Secretary of

Transportation; and (3) Defendant Peter M. Rogoff, in his official capacity as the Under

Secretary of Transportation for Policy of DOT (collectively, "Defendants" or "DOT").

## NATURE OF THIS ACTION

1.        This is an action under the Administrative Procedure Act ("APA"), 5 U.S.C.

§§ 701-706, and the National Environmental Policy Act of 1969 ("NEPA), 42 U.S.C. §§ 4321-

4345, to set aside as arbitrary, capricious, an abuse of discretion, in excess of statutory authority

and otherwise contrary to law DOT's allocation of $1,750,000,000 of tax-exempt private activity

bonds ("PABs") to build the All Aboard Florida ("AAF") Project, a proposed passenger rail line

between Miami and Orlando, Florida (the "Project").

2.        DOT's allocation of PABs to the Project—the largest PAB allocation to date[1]—is

improper, unjustified and unlawful because the statute on which DOT purports to rely does not

authorize the use of PABs for this type of project.  Under Section 142 of the Internal Revenue

Code ("I.R.C."), the Secretary of Transportation is authorized to allocate PABs among a discrete

set of transportation-related activities.  *See* 26 U.S.C. §§ 142(a) & 142(m).  Since the Project

does not fall within any of the activities listed in I.R.C. section 142, DOT appears to be trying to

fit an elephant into a mousehole.[2]

3.        Equally troubling, DOT made a final decision to allocate the bonds without

performing the pre-approval environmental review required by NEPA.  NEPA requires federal

agencies to take a "hard look" at the environmental (broadly defined) consequences of their

---

[1] *See* Federal Debt Financing Tools, Private Activity Bonds (PABS), U.S. Dep't of Transp., Fed.
Highway Admin., available at
http://www.fhwa.dot.gov/ipd/finance/tools_programs/federal_debt_financing/private_activity_bo
nds/.
[2] *See Whitman v. American Trucking Association*, 531 U.S. 457, 468 (2001) ("Congress . . . does
not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—
it does not, one might say, hide elephants in mouseholes").

actions *before* taking of those actions.  That includes the preparation of an environmental impact statement ("EIS") that details the anticipated impacts of the action and that thoroughly discusses reasonable alternatives to the action, including a "no-action" alternative.  Here, DOT has neither prepared an EIS nor taken a "hard look" at the Project.  Worse, it has effectively precluded any meaningful consideration of Project alternatives by taking steps to ensure that the Project goes forward at all costs.

4.      These facts are powerfully illustrated by DOT's December 22, 2014 Provisional Bond Allocation Approval Letter ("Approval Letter") approving the PAB allocation, attached hereto as **Exhibit 1**.  The Approval Letter does not merely approve issuance of the PABs – which AAF has described as the "linchpin" of its ability to implement the Project – it affirmatively *requires* the bonds to be issued by July 1, 2015.  It also makes explicit that DOT has already rejected the idea of any alternatives, before even bothering to evaluate those alternatives in a NEPA-required final EIS.  The Approval Letter notes that a final EIS has yet to be completed, but nevertheless concludes that "we look forward to the successful financing and delivery of your project."

5.      DOT's ill-considered and unlawful rush to approve the Project without complying with NEPA, and in excess of its statutory authority under Section 142 of the I.R.C., warrants an order from this Court vacating the PAB allocation approval pursuant to APA § 706.

## THE PARTIES

6.      Plaintiff Martin County is a duly organized county located in the Treasure Coast region of the State of Florida.  Martin County has over 151,000 residents.  By requiring substantial construction to accommodate increased rail traffic, the Project's construction would disrupt normal business activities in the County and impact personal activities of its residents.  At full operations, the Project will result in 32 passenger trains, pulled by diesel locomotives,

passing through the County daily at speeds of over 100 miles per hour. This disruption will result in traffic tie-ups near railroad crossings, safety concerns, noise, harm to County parks, and damage to neighborhoods and environmental resources in the County.

7.      Plaintiff Thomas L. Hewitt is a resident of Palm Beach County, one of seven coastal Florida counties through which the Project will be constructed and operated. He lives at 139 Commodore Drive, Jupiter, FL 33477. As a resident of Palm Beach County, in a community located close to the Project, Plaintiff Hewitt is adversely impacted by the Project and directly injured by the DOT's Approval Letter.

8.      Plaintiff V. Michael Ferdinandi is a resident of Palm Beach County, one of seven coastal Florida counties through which the Project will be constructed and operated. He lives at 1643 Hermitage Circle, Frenchman's Reserve, Palm Beach Gardens, FL 33410. As a resident of Palm Beach County, in a community located close to the Project, Plaintiff Ferdinandi is adversely impacted by the Project and directly injured by the DOT's Approval Letter.

9.      Defendant DOT is a federal agency responsible for transportation in the United States. DOT's statutory responsibilities are divided among different offices and "operating administrations" within DOT, including the Office of the Secretary and the following operating administrations: The Federal Highway Administration ("FHWA"), the Federal Transit Administration ("FTA"), the Federal Aviation Administration ("FAA") and the Federal Railroad Administration ("FRA"). Each operating administration has its own Administrator. The FRA is responsible for promulgating and enforcing rail safety regulations, administering railroad assistance programs, conducting research and development in support of improved railroad safety and national rail transportation policy, providing for the rehabilitation of Northeast

Corridor rail passenger service, and consolidating government support of rail transportation activities.

10.     Defendant Anthony R. Foxx is the Secretary of Transportation (the "Secretary").

11.     Defendant Peter M. Rogoff is the Under Secretary for Policy for DOT (the "Under Secretary").  In his official capacity, the Under Secretary was responsible for considering AAF's application for PABs and issuing the Approval Letter, the final agency action at issue in this Complaint.

## JURISDICTION AND VENUE

12.     This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331 and 5 U.S.C. § 702 et seq.

13.     Venue is proper in this district under 28 U.S.C. § 1391(e) because Defendant DOT is headquartered in the District of Columbia and Defendants Foxx and Rogoff are officers or employees of DOT.  Further, a substantial part of the events giving rise to Plaintiffs' claims occurred in the District of Columbia.

## STATUTORY AND REGULATORY BACKGROUND

*Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706*

14.     The APA provides that federal courts "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be— **(A)** arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; **(B)** contrary to constitutional right, power, privilege, or immunity; **(C)** in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;  **(D)** without observance of procedure required by law; **(E)** unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or **(F)** unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court."  5 U.S.C. § 706(2).

*National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. §§ 4321-4235*

15.     NEPA requires federal agencies to take a "hard look" at the environmental

consequences of their actions before undertaking those actions.  More specifically, for all "major

Federal actions significantly affecting the quality of the human environment," the responsible

agency official must prepare a "detailed statement," known as an environmental impact

statement, or EIS, on, among other items, the "environmental impact of the proposed action,"

"any adverse environmental effects which cannot be avoided should the proposal be

implemented," and "alternatives to the proposed action."  42 U.S.C. § 4332(c).  That requirement

ensures that federal agencies carefully consider the health, safety, and environmental impacts of

their proposed actions and that relevant information about those actions is made available to the

public.

16.     Pursuant to NEPA, the federal Council on Environmental Quality ("CEQ") has

promulgated regulations setting forth NEPA-related requirements for all federal agencies subject

to NEPA.  40 C.F.R. Parts 1500-1508.

17.     CEQ's regulations provide that each agency's NEPA procedures "must ensure

that environmental information is available to public officials and citizens before decisions are

made and before actions are taken."  40 C.F.R. § 1500.1(b).

18.     CEQ's regulations also confirm that preparation and public release of an EIS is

the cornerstone of the NEPA process.  The regulations provide that each EIS "shall provide full

and fair discussion of significant environmental impacts and shall inform decisionmakers and the

public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance

the quality of the human environment."  40 C.F.R. § 1502.1.  It further states that "[a]n

environmental impact statement is more than a disclosure statement.  It shall be used by Federal

officials in conjunction with other relevant material to plan actions and make decisions." *Id.*

Consistent with that purpose, the regulations further provide that "[e]nvironmental impact

statements shall serve as the means of assessing the environmental impact of proposed agency

actions, rather than justifying decisions already made." 40 C.F.R. § 1502.2(g).

19.     The obligation to prepare an EIS is triggered by "major Federal actions

significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(c). CEQ's

regulations define those terms and make clear that they are to be interpreted broadly. More

specifically, CEQ's regulations make clear that:

(i)      A "major Federal action" is one with "effects that may be major and
         which are potentially subject to Federal control and responsibility." 40
         C.F.R. § 1508.18. "Major reinforces but does not have a meaning
         independent of significantly," which is defined in Section 1508.27. *Id.*
         The types of actions that may be covered include, among others, "projects
         and programs entirely or partly financed, assisted, conducted, regulated, or
         approved by federal agencies," including but not limited to "actions
         approved by permit or other regulatory decision as well as federal and
         federally assisted activities." *Id.* § 1508.18(a), (b)(4).

(ii)     In assessing a proposed action's impact on the "human environment," the
         Federal agency is required to interpret that term "comprehensively" so as
         to cover economic, social, aesthetic, health, historical, cultural and
         ecological impacts, in addition to impacts on "the natural and physical
         environment and the relationship of people with that environment." 40
         C.F.R. §§ 1508.14, 1508.8(b).

(iii)    The term "significantly" requires considerations of both context and
         intensity, meaning that in determining whether a proposed federal action
         "significantly" affects the quality of the human environment the agency
         must consider, among other factors, the "degree to which the proposed
         action affects public health or safety"; "[u]nique characteristics of the
         geographic area such as proximity to historic or cultural resources, park
         lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically
         critical areas"; and the "degree to which the effects on the quality of the
         human environment are likely to be highly controversial." 40 C.F.R.
         § 1508.27.

20.     CEQ's regulations further explain that once an agency has completed an EIS for a

proposed action or project, it must document its decision to undertake that action in a "record of

decision." 40 C.F.R. § 1505.2. Subsequent legislation, the *Moving Ahead With Progress in the 21st Century Act* (MAP-21), allows federal agencies, in some circumstances, to prepare a single document that consists of a combined final EIS and record of decision. MAP-21 § 1319, P.L. 112-141. No legal authority exists, however, for issuing a record of decision in advance of completing a final EIS; in other words, a record of decision cannot be issued without a final EIS, even if it can be combined with a final EIS. In addition, CEQ's regulations expressly forbid federal agencies from taking any action in advance of the record of decision that would "[h]ave an adverse environmental impact" or that would "[l]imit the choice of reasonable alternatives" to the proposed action. 40 C.F.R. § 1506.1(a)(2).

21. DOT has also issued an order (Order 5610.1C) setting forth its procedures for complying with NEPA. DOT Order 5610.1C.[3] The order directs each of DOT's "operating administrations," including the FRA, to prepare their own "supplementary guidance" applying the NEPA requirements to their specific programs. DOT Order 5610.1C, ¶ 20.a(2). But for "actions originating within the Office of the Secretary, the official responsible for approval of environmental documents is the Office Director of the office originating the action." *Id.* at ¶ 21. These paragraphs make clear that where a major federal action significantly affecting the quality of the human environment is taken by the Office of the Secretary, that office is responsible for completion of environmental impact statements, not other operating administrations within DOT.

22. DOT's Order 5610.1C further provides that a proposed Federal action is considered "highly controversial"—requiring review of the final EIS for the action by DOT's General Counsel—"when the action is opposed on environmental grounds by a Federal, state, or

---

[3] DOT Order 5610.1C, available at http://www.dot.gov/sites/dot.gov/files/docs/Procedures_Considering_Environmental_Impacts_5610_1C.pdf.

local government agency or by a substantial number of the persons affected by such action."

DOT Order 5610.1C ¶ 11.d.

*Title 23 - Highways*

23.     Title 23 contains the principal set of rules and regulations related to highway

transportation in the United States, with over 600 sections organized into six chapters covering

(1) federal-aid highways; (2) other highways; (3) general provisions; (4) highway safety; (5)

research, technology, and education; and (6) infrastructure finance.  23 U.S.C. § 101, et seq.

24.     As it pertains to railroad-related projects, Title 23 permits funding solely for the

"elimination of hazards of railway-highway grade crossings."  23 U.S.C. § 101(a)(4)(E).

25.     Specifically, Title 23 permits funding for the limited purpose of "elimination of

hazards of railway-highway crossings, including the separation or protection of grades at

crossings, the reconstruction of existing railroad grade crossing structures, and the relocation of

highways to eliminate grade crossings . . . ."  23 U.S.C. § 130(a).

*IRC, 26 U.S.C. § 142 – Exempt Facility Bonds*

26.     Under 26 U.S.C. § 142, "the term 'exempt facility bond' means any bond issued

as part of an issue 95 percent or more of the net proceeds of which are to be used to provide—

        (1) airports,

        (2) docks and wharves,

        (3) mass commuting facilities,

        (4) facilities for the furnishing of water,

        (5) sewage facilities,

        (6) solid waste disposal facilities,

        (7) qualified residential rental projects,

        (8) facilities for the local furnishing of electric energy or gas,

(9) local district heating or cooling facilities,

(10) qualified hazardous waste facilities,

(11) high-speed intercity rail facilities,

(12) environmental enhancements of hydroelectric generating facilities,

(13) qualified public educational facilities,

(14) qualified green building and sustainable design projects, or

(15) qualified highway or surface freight transfer facilities."

26 U.S.C. § 142(a).

27.     As it relates to rail projects, exempt bond facilities may be used for (1) "high-speed intercity rail facilities," 26 U.S.C. § 142(a)(11); or (2) "qualified highway or surface freight transfer facilities."  26 U.S.C. § 142(a)(15).

28.     High-speed intercity rail facilities under 26 U.S.C. § 142(a)(11) are defined as "any facility (not including rolling stock) for the fixed guideway rail transportation of passengers and their baggage between metropolitan statistical areas (within the meaning of section 143(k)(2)(B)) using vehicles that are reasonably expected to be *capable of attaining a maximum speed in excess of 150 miles per hour* between scheduled stops, but only if such facility will be made available to members of the general public as passengers."  26 U.S.C. § 142(i)(1) (emphasis added).

29.     26 U.S.C. § 142(a)(11) and the related  26 U.S.C. § 142(i) were signed into law in 1988 (Pub. L. 100-747) and were amended in the American Recovery and Reinvestment Act of 2009 (Pub. L. 111-5) to substitute "be capable of attaining a maximum speed in excess of" for "operate at speeds in excess of."

30.     In 2005, Congress added 26 U.S.C. § 142(a)(15) and the related 26 U.S.C.

§ 142(m) to the fourteen categories explicitly listed in 26 U.S.C. § 142 to establish two new

types of projects qualified to receive a private activity bond allocation: (1) "Highway Projects"

and (2) "surface freight transfer facilities."  *See* Pub. L. 109-59.  These provisions were enacted

in the 2005 Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users

("SAFETEA-LU").  *Id.*

31.     According to Defendant DOT, "Section 11143 of Title XI of SAFETEA-LU

amended Section 142 of the Internal Revenue Code to add highway and freight transfer facilities

to the types of privately developed and operated projects for which private activity bonds (PABs)

may be issued."[4]

32.     Qualified highway or surface freight transfer facilities are defined, in relevant

part, as "any surface transportation project which receives Federal assistance under title 23,

United States Code" or "any facility for the transfer of freight from truck to rail or rail to truck

(including temporary storage facilities directly related to such transfers) which receives Federal

assistance under either title 23 or title 49, United States Code (as so in effect)."  26 U.S.C.

§ 142(m)(1)(A) and (C).

33.     The conference committee on the SAFETEA-LU bill accepted the Senate

Amendment's definition of a "qualified highway facility" as "any surface transportation or

international bridge or tunnel project (for which an international entity authorized under Federal

or State law is responsible) which receives Federal assistance under title 23 of the United States

Code (*relating to Highways*)."  H.R. Rep. No. 109-203, at 1144 (2005) (Conf. Rep.) (emphasis

---

[4] U.S. Dept. of Transportation, Federal Highway Admin., Tools & Programs, Federal Debt
Financing Tools, Privacy Activity Bonds (PABs),
http://www.fhwa.dot.gov/ipd/finance/tools_programs/federal_debt_financing/private_activity_bo
nds/.

added).  It also accepted the Senate Amendment's definition of a "qualified surface freight

transfer facility" as "a facility for the transfer of freight from truck to rail or rail to truck which

receives Federal assistance under title 23 or title 49 of the United States Code (relating to

Transportation)."  *Id.* at 1145.

34.     The Senate Finance Committee interpreted the provision in a similar manner,

stating in a memorandum on July 28, 2005—the day before the Senate voted on the conference

version of the bill—that: "The proposal authorizes $15 billion of tax-exempt bond authority to

finance *highway projects and rail-truck transfer facilities*.  Cost: $738 million over 10 years."

U.S. Senate Finance Comm. Mem. on the Conference Title of Transportation Reauthorization

Bill,  4 (July 28, 2005), http://www.finance.senate.gov/download/?id=5264AC0E-E831-4275-

9597-EA1154F9D2A4 (emphasis added).

35.     The FHWA has previously restricted the definition of a "highway project" to

exclude rail projects.  In 2006, FHWA, the agency directed by Section 6005 of SAFETEA-LU to

implement a "Surface Transportation Project Delivery Pilot Program," submitted a report to

Congress on its Section 6005 Activities.  FHWA defined a "highway project" as "any

undertaking to construct (including initial construction, reconstruction, replacement,

rehabilitation, restoration, or other improvements) a highway, bridge, or tunnel, or any portion

thereof, including environmental mitigation activities, which is eligible for assistance under title

23 of the United States Code."  The FHWA's definition specifically excludes certain types of

projects:

> Firstly, this definition *excludes planned multi-modal projects*.  Since these
> projects involve the transportation interests of agencies other than the FHWA, as
> well as features that are not unique to highways, the FHWA proposes to define
> "highway project" to *exclude those projects that are intended at project
> conception to be multi-modal*.

Fed. Hwy. Admin., Report to Congress on SAFETEA-LU Section 6005 Activities, FR Doc. E6-4911 (Apr. 4, 2006), http://www.environment.fhwa.dot.gov/strmlng/6005_05-06.htm (emphasis added).

36.     Internal Revenue Service Notice 2006-45 provides additional support that the provision is limited to only qualified *highway* or *surface freight transfer facilities*: "This notice provides guidance relating to exempt facility bonds for qualified highway or surface freight transfer facilities under sections 142(a)(15) and 142(m) of the Internal Revenue Code (the Code)."  I.R.S. Notice 2006-45, 2006-1 C.B. 891.

## FACTUAL BACKGROUND

### *The Project*

37.     The Project would establish a for-profit intercity passenger rail service sharing tracks with the existing freight rail service between Orlando and Miami, Florida.  AAF proposes in Phase I of the Project to construct three new rail stations (in West Palm Beach, Fort Lauderdale, and Miami), purchase five train sets, add a second track along an existing 66.5-mile corridor of the Florida East Coast Railroad ("FECR"), and add 16 round-trip (32 one-way) trips on the West Palm Beach to Miami corridor section of the FECR corridor.  Phase II of the Project involves, in substantial part, construction of additional new tracks extending the new passenger rail service from West Palm Beach north to Orlando and construction of a new rail station at Orlando International Airport.

38.     The Project will significantly increase the number and speed of trains passing through nearly 350 at-grade road crossings along the FECR corridor, 28 of which are located in Martin County and 26 of which are located in Palm Beach County.  Those at-grade road crossings create what the FRA has euphemistically called "opportunities for conflict" but what

would be more accurately described as "opportunities for catastrophic and fatal collisions between trains and cars and trains and people."

*AAF's RRIF Loan Application and FRA's Ongoing Environmental Review of the Project*

39.     On March 15, 2013, AAF submitted a Railroad Rehabilitation and Improvement Financial ("RRIF") Program loan application to the FRA.  *See* **Exhibit 2**.  Through its application, AAF requested a loan of $1,350,000,000 to fund the Project.  *Id.*  AAF subsequently increased the amount requested in this loan to $1,600,000,000.

40.     The FRA recognized that approving a loan for the Project would constitute "major Federal action[] significantly affecting the quality of the human environment" within the meaning of NEPA § 102(c), 42 U.S.C. § 4332(c).  Accordingly, it began the NEPA-required process of evaluating the environmental, economic, social, health and welfare impacts of the Project, including the preparation of a draft environmental impact statement ("DEIS"), which was to be followed (after a period of public review and comments) by a final environmental impact statement ("FEIS") and a final decision on AAF's loan application.  The FRA indicated that it would combine its NEPA analysis with the analyses required by the National Historic Preservation Act and the Department of Transportation Act of the Project's impacts on historic and recreational resources.  The FRA released a DEIS for the Project on September 19, 2014.[5]

41.     The DEIS—although seriously flawed in many material respects, including, among others, the failure to adequately consider reasonable alternatives to the Project and the failure to adequately assess the Project's impacts on marine navigation and public safety— confirmed that the Project would have multiple adverse impacts on Martin County and Palm Beach County and their residents, including, among others, adverse impacts to public health and

_____

[5] Federal Railroad Administration, *Draft Environmental Impact Statement and Section 4(f) Evaluation of All Aboard Florida Intercity Passenger Rail Project* (Sept. 19, 2014), www.fra.dot.gov/Elib/Details/L15976.

safety; transportation; navigation; social and economic conditions; air quality and vehicle

emissions; wildlife habitat; floodplain and wetlands; and threatened and endangered species.

The Project will also adversely impact social, economic, and community wellbeing.

42.     Numerous entities submitted comments on the DEIS objecting to both the Project

and the adequacy of the DEIS.  Those entities include, among others, Plaintiff Martin County,

Indian River County, St. Lucie County, Town of Jupiter Island, Florida and Citizens Against Rail

Expansion in Florida ("CARE FL").[6]

43.     As of the filing of this Complaint, the FRA has not released a FEIS and has not

completed the reviews required by NEPA, the NHPA and the DOT Act.  Nor has any other

federal agency, office or operating administration done so.

*AAF Private Activity Bond Application*

44.     On August 15, 2014, AAF submitted an application to DOT's Office of

Infrastructure Finance and Innovation, an office within DOT's Office of the Secretary, which is

itself separate and distinct from the FRA, requesting an allocation of $1.75 billion in PAB

volume.  *See* **Exhibit 3**, at 1.  In its application, AAF stated that "[t]he private activity bond

financing described in the enclosed application is the *linchpin for completing our project*." *Id.*

(emphasis added).  AAF further stated that it would "use the proceeds of these private activity

bonds to finance construction of our intercity passenger rail service linking Miami and Orlando,

with intermediate stops in Fort Lauderdale and West Palm Beach." *Id.*

45.     AAF stated that "[a]lthough construction is well underway, completing the

entirety of our Miami-to-Orlando service requires significant additional financing.  We are

---

[6] Indian River County is party to a related action currently before this Court.  *See Indian River Cnty., et al. v. Rogoff, et al.*, No. 1:15-cv-00460-CRC (D.D.C.).

applying for a $1.75 billion private activity bond allocation to pursue this financing in the most expedient manner possible and with the highest degree of execution certainty." *Id.*

46.     AAF further stated that "[p]roceeds from a $1.75 billion private activity bond issuance would be deployed *across the length of our passenger rail system*, including the Miami-to-West Palm Beach segment.  We believe this use of proceeds is a crucial factor in ensuring our project is financed and completed." *Id.* (emphasis added)  AAF also indicated that "we are pursuing a $1.75 billion financing for the *entire Miami-to-Orlando corridor*." *Id.* at 2 (emphasis added).

47.     As a major federal action, AAF's Project will require permits from the following federal, Florida state and county agencies:

- Federal Highway Administration
- U.S. Army Corps of Engineers
- Federal Aviation Administration
- U.S. Fish and Wildlife Service
- National Marine Fisheries Service
- U.S. Coast Guard
- Florida State Historic Preservation Office
- Florida Department of Environmental Protection
- South Florida Water Management District
- Florida Department of Revenue
- Florida Fish and Wildlife Conservation Commission
- Orange County
- Broward County
- Miami-Dade County

*Id.* at 8.

48.     AAF's PAB application indicated that "[t]he Project has already received financial assistance under Title 23 of the U.S. Code.  The planning process for [AAF] started in December 2011.  Since then, approximately $9.3 million in funds from Section 130 of U.S. Code Title 23 has been invested in the corridor to improve railway-highway grade crossings and to

prepare the corridor for growth in rail traffic, including the introduction of passenger service."

*Id.* at 10.

49.     Based on publicly available information, AAF has selected Siemens to

manufacture the train sets to be used on proposed Miami-to-Orlando rail line.[7]  The selected

Siemens trains will operate "at maximum speeds up to 125 mph."[8]

*Florida Development Finance Corporation Approval of the Project*

50.     The Florida Development Finance Corporation ("FDFC") is the entity listed by

AAF as the issuer of the PABs at issue in this Complaint.  Pursuant to its statutory mandate, the

FDFC Board is required to have five members appointed by the Governor of Florida and

confirmed by the Senate for four-year terms.  Further, FDFC Board members must be

re-nominated and reconfirmed every four years.

51.     On August 20, 2014, FDFC held a vote regarding issuance of PABs to AAF and

voted 3-0 in favor of the PAB allocation request.  At the time of the vote, the FDFC only had

three Board members – Rebecca Reynolds, William Jones, and Frank DiBello.  Reynolds was

the only Board member who had been confirmed by the Senate within the past twelve years.

Jones was confirmed in 2002 and re-nominated in 2010, but was not confirmed by the Senate.

DiBello was neither nominated by the Governor nor confirmed by the Senate.

52.     The FDFC Board's August 2014 action induced Brevard and Miami-Dade

counties to amend their respective interlocal agreements with the FDFC to support a financing

plan for AAF.  In Brevard County on October 21, 2014, FDFC legal counsel Joseph Stanton

---

[7] Paul Brinkmann, *Siemens to build All Aboard Florida trains*, Orlando Sentinel (Sept. 11, 2014), http://www.orlandosentinel.com/business/brinkmann-on-business/os-siemens-selected-to-build-all-aboard-florida-trains-20140911-post.html.
[8] *All Aboard Florida Selects Siemens as Train Manufacturer*, Siemens (Sept. 11, 2014), http://news.usa.siemens.biz/press-release/rail-systems/all-aboard-florida-selects-siemens-train-manufacturer.

appeared before the county commissioners and stated "the FDFC board has provided its initial approval for this transaction; and they respectfully request Board approval of the proposed amendment."  On the same day in Miami-Dade County, county commissioners approved a resolution that stated the Project would be constructed "with the assistance of FDFC."  Both counties relied on the FDFC Board's authority to issue PABs for AAF.  Without that authority, neither county action is valid.

53.    On September 24, 2014, AAF submitted a PAB application to FDFC and submitted the same material to DOT as a supplement to AAF's August 15, 2014 PAB application.  *See* **Exhibit 4**.  In this September 24 submission, AAF responded "No" to the following question: "Are you aware of any reason why any local governmental unit (City, County, Special District, etc.) would not want Florida Development Finance Corporation to issue bonds in connection with this transaction?"  *Id.*  AAF indicated it "has received clear and consistent support from each county in which proceeds from the proposed private activity bond issuance will be invested."  *Id.*

54.    While AAF stated in its FDFC application that it would not allocate funding in Indian River, Martin, and St. Lucie Counties, the Project route goes directly through these counties and will require both AAF and the counties to incur substantial costs associated with the Project.  Each of these counties strongly opposed the Project at the time of the August 15, 2014 PAB application submitted to DOT—opposition which was well known to AAF—and each county continues to oppose the Project to this day.  AAF nonetheless indicated to FDFC that the Project has unanimous support of the counties and towns along the Project route.

*DOT Approval of AAF's Application for Private Activity Bonds*

55.    On December 22, 2014, DOT informed AAF that it had "reviewed [AAF's] application . . . and applicable statutory and regulatory requirements . . . [and] provisionally

allocate[ed] up to $1.75 billion of private activity bond authority to the Florida Development Finance Corporation . . . ."  *See* **Exhibit 1**.  Although styled as a "provisional" approval of tax-exempt bonds for the Project, the Under Secretary's December 2014 Approval Letter is anything but provisional.  The Approval Letter is final agency action subject to judicial review under the APA.

56.     First, the Approval Letter marks the consummation of DOT's decision-making process with respect to approval of the bond allocation.  The Approval Letter does not merely allocate the bonds, it dictates that the bonds "must be issued by July 1, 2015" and further provides that if the bonds have not been issued by that date the allocation automatically expires.  Nowhere does the Approval Letter suggest, let alone state, that DOT is still reviewing AAF's application and will make a final decision about the application in the future; the Approval Letter itself is that final decision.  For example, although the Approval Letter mentions that FRA is expected to issue a final EIS at some unidentified point in the future, nowhere does it suggest that completion of the EIS is part of DOT's process for deciding whether or not to allocate the bond authority.  The Approval Letter suggests only that completion of the EIS is a pre-condition to *spending* the bond proceeds.  The decision to allocate the bonds and direct that they be issued has been made.

57.     Second, the Approval Letter determines legal rights and obligations and is a document from which legal consequences flow.  The Approval Letter authorizes the bonds to be issued and indicates that they "must" be issued by a set date.  The issuance of the Approval Letter is the "linchpin" enabling AAF to move forward with the Project.

58.     DOT's Approval Letter provided no justification or explanation of the statutory or regulatory authority utilized to approve AAF's application for $1.75 billion in PABs.

59.     On March 20, 2015, U.S. Representative Bill Posey (FL-8th District) sent a letter to the Inspector General of DOT noting that "[t]his controversial project is of great concern to my constituents, for reasons related to safety, the environment, quality of life, and taxpayer burden."  **Exhibit 5**.  Rep. Posey requested that DOT respond to several specific questions regarding the statutory authority for DOT's approval of AAF's PAB application.  *Id.* at 2.  In particular, Rep. Posey sought clarification about his concern that the approval of PABs for AAF's Project "is inconsistent with the high-speed rail provision in IRC Section 142(a)(11), as every single rail project in the county has railway-highway crossings and would therefore qualify under Section 142(a)(15) and 142(m)."  *Id.*  He further questioned whether DOT's decision "makes this PAB law itself a nullity, as it disregards the fifteen explicit categories of qualified projects in the statute and essentially places no limits on what constitutes a qualified project."  *Id.*  Finally, Rep. Posey requested that DOT "point [him] to Congressional language that implies [that] Title 23 provides funding for an entire rail project—not just funding for the work on railway-highway crossing themselves—so long as the project has such crossings" and requested that DOT identify all similar rail projects that have received Federal assistance as "qualified highway or surface rail freight transfer facilities" under IRC Sections 142(a)(15) and 142(m).  *Id.*

60.     On information and belief, as relayed by the office of U.S. Representative Patrick Murphy (FL-18th District), DOT initially indicated verbally that it approved AAF's request to allocate $1.75 billion in PABs based on its perceived authority under Title 23.  Title 23 was cited by AAF in its application to DOT as the basis for the Project's eligibility to obtain and use PABs.  *See supra* ¶ 48.  As discussed in ¶¶ 23-25, *supra*, Title 23 pertains to highways and permits funds to be used for rail projects in limited contexts (*e.g.*, hazards and rail crossings).

61.     On April 3, 2015, over four months after DOT's Approval Letter was issued to

AAF, Rep. Murphy received a letter response from Defendant Anthony Foxx, Secretary of

Transportation.  The Secretary indicated that "AAF's application is eligible [for PABs] under 26

U.S.C.  § 142(m), which states that a 'qualified highway and surface transfer facility' may

include 'any surface transportation project which receives Federal assistance under Title 23,

United States Code.'"  *See* **Exhibit 6**.  The Secretary went on to note that "[s]ince the passenger

rail plans were first announced in 2012, the Florida Department of Transportation has spent

approximately $9.3 million of funding that was provided under the State's Federal

apportionment under section 104 of title 23 to eliminate railway-highway crossing hazards along

the project corridor."  *Id.*  The Secretary unequivocally stated that the $9.3 million in Title 23

assistance "makes [AAF's project] eligible under the statutory definition" authorization to issue

$1.75 billion in PABs.  *Id.*  Finally, the Secretary acknowledged that he was "very much aware

of the sensitivities surrounding this project" and that DOT had secured "AAF's written

agreement to complete the ongoing Federal Railroad Administration's environmental review

process and to fulfill all of their obligations with the Final Environmental Impact Statement."  *Id.*

However, the Secretary did not rescind or otherwise alter DOT prior approval for AAF to market

and sell up to $1.75 billion in PABs by July 1, 2015.

62.     On April 9, 2015, U.S. Representative Bill Posey (FL-8[th] District) sent a letter to

Kathryn B. Thomson, DOT's General Counsel, expressing that "[t]his controversial project is of

great concern to thousands of my constituents, for reasons related to safety, the environment,

quality of life, and taxpayer burden."  *See* **Exhibit 7.**  Rep. Posey raised several questions related

to the Project:

- "In this case did the DOT have the statutory authority to issue PABs to a passenger·
  railroad under Title 23?"  *Id.* at 2.

- "Do you believe this conclusion by DOT is inconsistent with the high-speed rail provision in IRC Section 142(a)(11), as every single rail project in the country has railway-highway crossings and would therefore qualify under Section 142(a)(l5) and 142(m)?" *Id.*
- "Do you believe this interpretation makes this PAB law itself a nullity, as it disregards the fifteen explicit categories of qualified projects in the statute and essentially places no limits on what constitutes a qualified project?" *Id.*
- "Can you point me to Congressional language that implies Title 23 provides funding for an entire rail project—not just funding for the work on railway-highway crossings themselves—so long as the project has such crossings?  Doesn't that essentially provide the Secretary a blank check to use a road crossing of a railroad as a way to circumvent the statute and give the Secretary's overly broad authority?" *Id.*
- "Can you please provide me with a list of all similar rail projects that have received Federal assistance as 'qualified highway or surface freight transfer facilities' under IRC Sections 142(a)(15) and 142(m)?" *Id.*
- "Do you believe that this statement [in the Approval Letter, the Undersecretary noted that '[t]he USDOT appreciates your interest in the private activity bond program and we look forward to the successful financing and delivery of your project' should have been made while the DEIS analysis is being undertaken by the DOT?" *Id.* at 3.
- "By allowing AAF to issue bonds to investors during this critical stage of the NEPA process, are you concerned that the DOT is circumventing the NEPA process?" *Id.*
- "By creating this imbalance of interests, has the DOT effectively prejudged the fitness of the AAF project and rendered citizens', towns', and counties' NEPA rights toothless?" *Id.*
- "Is it standard procedure for the DOT to authorize public financing resources for projects of this magnitude before it has been established whether or not a project is safe and feasible?" *Id.*

*The Project is Not Economically Sound*

63.     In February 2015, Brown University Professor John N. Friedman, who served as Special Assistant to the President for Economic Policy at the National Economic Council from 2013-2014, published a study entitled "An Economic Analysis of All Aboard Florida."  *See* **Exhibit 8**.  Professor Friedman's report indicates AAF will not be able to pay its debt if it sells the $1.75 billion in PABs.  *Id.*  He examined the cost to taxpayers of the tax exemption granted by DOT, stating in pertinent part that the tax exempt bonds "represent roughly a $37 million annual subsidy for the project, of which roughly 75% accrues to AAF itself and 25% accrues to investors."  *Id.* at 12.  Professor Friedman further indicated "the tax-payer subsidy would rise to

$60 million per year" based on a less favorable bond coupon rate. *Id.* The damage to the United States taxpayers, including the taxpayers of Martin County and Palm Beach County, is actual damage even if the full extent of damage is not yet ascertainable.

*Harms to Martin County and its Residents*

64.    By allocating PAB funds for the Project without performing the pre-approval environmental review required by NEPA, the Defendants have inflicted procedural and informational injuries on Martin County. Defendants have deprived Martin County of the opportunity to participate in and benefit from the NEPA process. More specifically, they have deprived Martin County of its statutory right to participate in a formal environmental review process in which it would have the opportunity to (i) educate the Defendants about the adverse impacts of the project and the availability of reasonable alternatives, including a "no-action alternative; and (ii) obtain information about the Project's rationale, impacts and potential alternatives.

65.    The Project itself will have multiple adverse effects on Martin County and its residents, including but not limited to adverse effects on traffic congestion, marine vessel congestion, noise, air quality, public safety, the county's economic development plans (especially, but not exclusively, for the county's Community Redevelopment Areas, discussed further, *infra* at ¶¶ 80-83) and historic and cultural resources within the County, as well as on the County's parks, wildlife, ecology, wild and scenic river, threatened and endangered species, property values, economic vitality and quality-of-life. DOT's decision to approve AAF's PAB application all but ensures that the Project will go forward and that its harms will be felt.

66.    Martin County employs many individuals who travel to and from work by car or other motor vehicle and that will be inconvenienced and burdened by increased traffic

congestion resulting from the Project.  The same is true for Martin County employees that must use vehicles as part of their job duties, such as building inspectors.

67.     The Project will cause increased traffic congestion at road crossings throughout Martin County.  The FRA DEIS for the Project, for example, identifies five Martin County intersections where passenger trains are anticipated to cause traffic delays of at least one minute (and in some cases more than four minutes) *twice an hour* every day.

68.     The increase in trains commuting through Martin County will adversely impact emergency response times for Martin County Fire & Rescue, a department of Martin County. There are several large communities served by Martin County Fire & Rescue Stations— including Jupiter Island, Hobe Sound, Port Salerno, Jensen Beach and South County—which requires Martin County Fire & Rescue to cross railroad tracks to provide essential services.

69.     Martin County Fire & Rescue owns and operates over 58 vehicles, including rescues (18), engines (13), quints (3), tankers (6), brush trucks (10), specialty (5), Battalion Chief and Rescue Lieutenant sport-utility vehicles (7), and additional vehicles for the department's Chiefs and for fire prevention activities in Martin County.  In 2013, Martin County Fire & Rescue vehicles crossed railroad tracks more than 6,600 times while responding to incidents, and more than 4,100 times when transporting to area hospitals, for a total of over 10,700 times.  This data does not include units returning to quarters or responding to other incidents which required crossing a railroad track.

70.     Martin County Fire & Rescue experienced railroad crossing delays 140 times per year in 2013 and 2014.  Based on the estimated increase in trains, there will be substantially more delays if the AAF's Project proceeds as planned.  These delays occur during response to emergencies and while transporting sick or injured patients to hospitals.  These delays could

significantly impact service levels adopted by Martin County to respond to emergencies in the community.

71.     Increased delays in emergency services could also lead to increased deaths, for example as ambulances are delayed in reaching local hospitals.  As Dr. Michael Collins, the Medical Director for the Jupiter Medical Center's emergency department has publicly stated in relation to the Project:

> Sometimes eight seconds, fifteen seconds, thirty seconds is all we have to save a life in the emergency department.  I'm very concerned about multiple trains going through our community, starting traffic jams that keep ambulances from getting to us.  We get twenty percent of our patients via ambulance.  We get almost all of Tequesta's ambulance patients, and the thought of them waiting behind multiple crossings during the day is worrisome to me.  Well, you can say that ambulances can get through traffic jams because they have horns and sirens, but I'm also concerned about physicians that are trying to get to our hospital, obstetricians, surgeons, cardiologists, neurologists.  Seconds do count in the world of critical care, and I feel that All Aboard Florida needs to address these issues to the public.  They need to explain what their plan is to prevent communities from being cut off from their hospitals.  In critical care times, seconds count.[9]

72.     Martin Medical Center serves as the main hospital for Martin County.  This facility provides cardiac intervention, primary stroke care, and treatment to trauma patients who cannot safely be transported to a trauma center.  This facility is divided from the majority of the population by the railroad.  Delays in transporting patients to this facility would significantly increase as a result of the Project.  In 2013, over 4,100 patients had to be transported over a railroad track to reach their local hospital.

73.     Martin County neighbors the St. Lucie Nuclear Power Plant and must have plans to rapidly evacuate residents in the Emergency Planning zone if a plant emergency occurs.  Due to population density east of the current coastal railway, evacuation times for local emergencies would be greatly increased with railroad crossings being closed.  All evacuation routes from the

---

[9] A video of Dr. Collins' comments can be found here: http://www.saveourfl.com/news-conference-jupitermedical-center.

affected areas are crossed by an existing railroad, an impediment that will be compounded by AAF's Project and directly harm public health and safety in Martin County.

74.     Estimated evacuation of the north Jensen Beach and Hutchinson Island Emergency Planning Zone shows an optimal time of 5.5 hours.  This evacuation would be impeded by the increased train operations, affecting evacuation times by as much as an additional 45 minutes.  This will directly and adversely impact public health and safety in Martin County.

75.     There are currently no pedestrian facilities at 10 of the 28 track crossings in Martin County.  Pedestrians and bicyclists will be directed to cross the rail in the roadway, increasing the probability that Martin County residents will suffer pedestrian injuries and fatalities.

76.     As a result of increased rail traffic caused by the Project, it will be difficult for Martin County Fire & Rescue to evacuate properties east of the track if there is a hazardous material spill or leak in the rail corridor.

77.     Martin County is home to twelve elementary schools, five middle schools, and five high schools located throughout the County, owned and operated by Martin County School District.  Martin County's SE Bridge Road school produces queues at the traffic signal at SE Gomez Avenue in the morning when school is in session.  In addition to traffic created by student drop offs at the two schools, service workers travel eastbound on SE Bridge Road in the morning to work on Jupiter Island.  Currently, the traffic often queues over the tracks and remains stationary through several signal cycles.  Increasing the number and speed of trains passing in close proximity to Martin County schools will disrupt the smooth and safe operation of those schools.

78.     Martin County owns 26 pieces of property that are adjacent to the proposed AAF route and will be adversely impacted by increased rail traffic.  These properties include numerous rights-of-way and public parks, such as Jonathan Dickenson State Park; South County Ball Park; Wojcheszak Park; and Dixie Park.  Additional Martin County properties that will be adversely impacted by the Project include the Martin County building housing the Veterans of Foreign Wars Hall; the Martin County Fire & Rescue station on Dixie at Bayview; the Martin County Parks and Recreation Department Headquarters; the Martin County Fairgrounds; and Martin County's Witham Field Airport.  Increasing the number and speed of trains passing in close proximity to these Martin County properties will negatively impact the County's operations of these properties.

79.     The Project will significantly increase closures of the St. Lucie River Bridge in Martin County, which will harm Martin County's economy and adversely impact the safety of County residents.  The St. Lucie Bridge, built circa 1938, must raise itself to allow maritime traffic and close preventing that traffic to allow vessel passage.  Hundreds of vessels per day transit through the bridge opening on peak days, varying between large and small recreational vessels and tugs with commercial barges.  The increased train traffic that will be caused by the Project will significantly increase wait times for maritime traffic, an issue that is compounded by limited space for the passage of vessels that does not easily or safely allow for simultaneously two-way traffic.  Many vessels will be forced to loiter for significantly more time waiting for the bridge to reopen, burning fuel, increasing air emissions, wasting time, and increasing the risk of vessels colliding with each other, running aground or being set upon the bridge by local tidal currents.  Increased closures of the St. Lucie Bridge—directly caused by the Project—will deter waterway use, negatively impacting Martin County's economy.

80.     The Project will also have a significant adverse effect on Martin County's economic development plans, including but not limited to its efforts to improve conditions in its Community Redevelopment Areas ("CRAs").

81.     Under Florida law (Chapter 163, Part III), local governments are able to designate areas as CRAs when certain conditions exist, such as the presence of substandard or inadequate structures; a shortage of affordable housing; inadequate infrastructure; insufficient roadways; and inadequate parking.  Martin County has designated several CRAs, thereby enabling it to access tools needed to foster and support redevelopment of the targeted area.  CRAs use these tools to secure improvements to the environment, infrastructure and real estate property which stabilize and increase the property values within each area.  Such actions involve providing infrastructure to otherwise blighted property to increase market value and to attract private investment. Projects are also undertaken to raise the standard and quality of living to underserved and minority groups.

82.     CRAs utilize tax increment financing to fund capital improvements and redevelopment activities in Martin County.  The dollar value of all real property in the CRA is determined as of a fixed date, also known as the "frozen value."  Taxing authorities that contribute to the tax increment continue to receive property tax revenues based on the frozen value.  These frozen value revenues are available for general government purposes.  However, any tax revenues from increases in real property value, referred to as "increment," are deposited into the CRA Trust Fund and dedicated to the redevelopment area.  If property values adjacent to the rail corridor decline, the funding available for redevelopment will be reduced or eliminated, adversely impacting the redevelopment of communities in Martin County and reducing property values within the buffer areas.

83.     The FEC corridor bisects five Martin County CRAs.  The Project will cause

increased railroad traffic, noise, and vibration in each of the County's five affected CRAs,

thereby making the redevelopment process more burdensome for County officials.  The impacts

on the CRAs also reveal that the Project is especially harmful to poorer residents of Martin

County.

*Harms to Plaintiff Hewitt*

84.     The Project's construction would disrupt Plaintiff Hewitt's personal activities and

impact the enjoyment of his home and other resources located in Palm Beach County.  If the

Project proceeds as planned, the resulting increase in the number of passenger and freight rail

trains traveling through his community will adversely impact the safety and quality of life in his

community.  The disruption caused by the increase in train traffic would result in serious safety

concerns for Plaintiff Hewitt, including traffic tie-ups near railroad crossings and the inability to

use boats on the river without impediments to navigation, noise, harm to Palm Beach County

parks, and damage to neighborhoods and environmental resources in Palm Beach County.

*Harms to Plaintiff Ferdinandi*

85.     The Project's construction would disrupt Plaintiff Ferdinandi's personal activities

and impact the enjoyment of his home and other resources located in Palm Beach County.  If the

Project proceeds as planned, the resulting increase in the number of passenger and freight rail

trains traveling through his community will adversely impact the safety and quality of life in his

community.  The disruption caused by the increase in train traffic would result in serious safety

concerns for Plaintiff Ferdinandi, including traffic tie-ups near railroad crossings and the

inability to use boats on the river without impediments to navigation, noise, harm to Palm Beach

County parks, and damage to neighborhoods and environmental resources in Palm Beach

County.

## COUNT I:

## VIOLATION OF NEPA AND ITS IMPLEMENTING REGULATIONS

86.     Plaintiffs incorporate by reference and re-allege herein the foregoing allegations.

87.     DOT's Approval Letter constitutes final agency action subject to judicial review under the APA.  The Approval Letter marks the consummation of DOT's decision-making process with respect to approval of the bond allocation, determines legal rights and obligations, and is a decision from which legal consequences flow.

88.     The Approval Letter is a major federal action significantly affecting the quality of the human environment.  The Approval Letter provides authority for the Project sponsor, AAF, to undertake "private activity bond financing" that is "the linchpin for completing [the] project."  **Exhibit 3** at 1.  The Project will have significant adverse impacts on the quality of the human environment, including but not limited to negative air quality, health, safety, traffic, marine navigation, and economic and environmental impacts in Martin County and Palm Beach County.

89.     The impacts of the Project are "highly controversial" within the meaning of 40 C.F.R. § 1508.27(b)(4), and the Project itself is "highly controversial" within the meaning of DOT Order 5610.1C § 11.d, as evidenced by the opposition to the Project on environmental grounds by Martin County and other local government entities.  DOT Secretary Foxx has publically acknowledged that he "is aware of the sensitivities surrounding this project" and stated "[f]or this reason" DOT has secured AAF's agreement to complete the ongoing environmental review being conducted by the FRA.  **Exhibit 6**.  But NEPA requires that environmental review to be performed *before* DOT takes final action approving the Project's "linchpin," not after.

90.     The Project and the Approval Letter do not fall within any DOT categorical exclusions to NEPA's requirements.

91.     DOT did not prepare a final EIS for the Approval Letter and did not conduct any other environmental review required by NEPA and its implementing regulations prior to issuing the Approval Letter.

92.     NEPA and its implementing regulations require federal agencies to carefully, thoroughly and fairly assess reasonable alternatives to their proposed actions before taking those actions, and to document their consideration of those alternatives in a final EIS completed before the action is taken.  Issuance of the Approval Letter without preparing a final EIS and without complying with NEPA and its implementing regulations directly harms Plaintiffs by depriving them of the procedural and information protections guaranteed by NEPA and its implementing regulations, by limiting the choice of reasonable alternatives to the Project, and by precluding any meaningful DOT review of such alternatives.

93.     DOT's failure to comply with NEPA and its implementing regulations, as set forth above, is arbitrary, capricious, an abuse of discretion, in excess of statutory authority and otherwise contrary to law within the meaning of the APA, 5 U.S.C. § 706(2).  DOT's failure to comply with NEPA by preparing a final EIS before issuing the Approval Letter also constitutes agency action unlawfully withheld or unreasonably delayed within the meaning of the APA, 5 U.S.C. § 706(1).

94.     Finally, to the extent Defendants are attempting to rely on the forthcoming FRA final EIS to satisfy their obligations under NEPA, their attempt to do so is arbitrary, capricious, an abuse of discretion, in excess of statutory authority and otherwise contrary to law for at least three separate and independent reasons.  First, NEPA requires that an EIS be prepared *before*

agencies take actions such as the Approval Letter, not after those actions have been taken.  Second, as noted above, the Approval Letter precludes any meaningful discussion of reasonable alternatives in the EIS—in direct contravention of NEPA and its implementing regulations—because it directs that the bonds must be issued by July 1, 2015, regardless of when the EIS has been completed.  Third, DOT's own internal NEPA procedures require that that when the Secretary's Office originates a major federal action—such as the Approval Letter issued by the Secretary's Office—the Secretary's Office, not DOT's operating administrations such as the FRA, is responsible for approval of the EIS.  DOT Order 5610.1C § 21.

## COUNT II:

## ILLEGAL ACTION BY DOT BY APPROVING $1.75 BILLION IN PAB FUNDING

95.    Plaintiffs incorporate by reference and re-allege the foregoing allegations.

96.    Title 23 of the United States Code, the statutory authority referenced by AAF in its own PAB application to DOT as the basis for its eligibility to receive funding, does not permit DOT to allocate PABs to AAF.  Based on the plain statutory language, Title 23 does not permit funding for this type of rail project; rather, it permits funding for "elimination of hazards of railway-highway grade crossings."  23 U.S.C. § 101(a)(4)(E).  Accordingly, DOT's approval of AAF's PAB application was arbitrary, capricious, an abuse of discretion, in excess of statutory authority and is subject to judicial review under the APA.

97.    According to DOT's Federal Highway Administration's website, "Section 11143 of Title XI of SAFETEA-LU amended Section 142 of the Internal Revenue Code to add highway and freight transfer facilities to the types of privately developed and operated projects for which private activity bonds (PABs) may be issued."

98.    26 U.S.C. §§ 142(a)(15) and 142(m) define "qualified highway or surface freight transfer facilities" as "any surface transportation project which receives Federal assistance under

title 23," or "any facility for the transfer of freight from truck to rail or rail to truck."  26 U.S.C. § 142(a)(11), provides that PABs can be issued for "high-speed intercity rail facilities" so long as the trains "are reasonably expected to be capable of attaining a maximum speed in excess of 150 miles per hour between scheduled stops."  *Id.* § 142(i)(1).

99.     Based on the legislative history outlined above, *supra* ¶¶ 26-36, 26 U.S.C. 142 § (a)(15) and 142(m) were enacted in 2005 to add qualified highway projects and surface freight transfer facilities to the list of categories already eligible to receive PAB allocation—not passenger rail projects, which are covered under the parameters of 26 U.S.C. 142 § (a)(11) and 142(i).

100.    DOT acknowledges that the AAF passenger rail Project does not qualify as high-speed rail under 26 U.S.C. § 142(a)(11) since it will not exceed 150 miles per hour.  Rather, the Secretary has unequivocally indicated that AAF is eligible for a PAB allocation as a "surface transportation project" that receives federal assistance under Title 23 to eliminate railway-highway crossing hazards.  *See* **Exhibit 6**.

101.    Thus, DOT has arbitrarily concluded that because the Project will have a number of railway-highway crossings, it is eligible to receive a $1.75 billion PAB allocation as a "qualified highway or surface freight transfer facility."  Based on AAF's own submission to DOT and public statements, AAF intends to use the $1.75 billion to fund the entire Project, not just the safety improvements that are authorized by Title 23.

102.    This conclusion also renders meaningless the high-speed rail provision in 26 U.S.C. § 142(a)(11)—since, on information and belief, virtually every single rail project in the country has railway-highway crossings and would therefore qualify under 26 U.S.C. §§ 142(a)(15) and 142(m).  This interpretation makes the law itself a nullity as it disregards the

33

fifteen explicit categories of qualified projects in the statute and essentially places no limits on

what constitutes a qualified project.  DOT could allocate funds for nearly any project,

irrespective of these limits enacted by Congress.  This interpretation is clearly in conflict with the

law and renders DOT's agency decision-making illegal.

## PRAYERS FOR RELIEF

103.    WHEREFORE, the Plaintiffs respectfully request that the Court enter the

following relief:

a.    Declare that DOT's decision to authorize the issuance of PABs to AAF was unlawful and has no effect.

b.    Temporarily and permanently enjoin Defendants from issuing PABs to AAF for general purposes that exceed the limited scope of what may be permitted under Title 23.

c.    Reimburse Plaintiffs' attorneys fees and costs a permitted by the Equal Access to Justice Act, 28 U.S.C. § 2412.

d.    Maintain jurisdiction over this civil action to ensure Defendants' compliance with the Court's orders; and

e.    Any other relief that the Court determines to be appropriate for a full and final judgment with respect to all of the Plaintiffs' claims.

Respectfully submitted,

s/ Michael Durham

Michael Durham (*pro hac vice* application being filed concurrently)
MARTIN COUNTY ATTORNEY'S OFFICE
2401 SE Monterey Road
Stuart, FL  34996
Tel: (772) 288-5440
Email: mdurham@martin.fl.us

*Counsel for Plaintiff Martin County*

s/ Amandeep S. Sidhu

Stephen M. Ryan (D.C. Bar No. 359099)
Amandeep S. Sidhu (D.C. Bar No. 978142)
McDermott Will & Emery LLP
The McDermott Building
500 North Capitol Street NW
Washington, DC 20001
Tel: (202) 756-8000
Email: sryan@mwe.com
Email: asidhu@mwe.com

Jacob Hollinger (D.C. Bar No. 1018833, *pro hac vice*
application being filed concurrently)
McDermott Will & Emery LLP
340 Madison Avenue
New York, NY 10173
Tel: (212) 547-5400
Email: jhollinger@mwe.com

*Counsel for Plaintiffs Martin County, Thomas Hewitt, and
V. Michael Ferdinandi*