```
 1                  IN THE UNITED STATES DISTRICT COURT
                       FOR THE DISTRICT OF COLUMBIA
 2        - - - - - - - - - - - - - - - x
          INDIAN RIVER COUNTY, et al.,
 3                                        CA No:  1:15-cv-00460-CRC
                        Plaintiffs,       CA No:  1:15-cv-00632-CRC
 4
                                          Washington, D.C.
 5                                        Friday, July 6, 2015
          vs.                             2:07 p.m.
 6
          PETER M. ROGOFF, et al.,
 7
                        Defendants.
 8        - - - - - - - - - - - - - - - x

 9        _____

10                  TRANSCRIPT OF TELEPHONIC CONFERENCE
              HELD BEFORE THE HONORABLE CHRISTOPHER R. COOPER
11                     UNITED STATES DISTRICT JUDGE
          _____

12        APPEARANCES:

13        For the Plaintiff:      PHILIP E. KARMEL, ESQ.
                                  BRYAN CAVE LLP
14                                1290 Avenue of the Americas
                                  New York, New York  10104-3300
15                                (212) 541-2311
                                  pekarmel@bryancave.com
16
                                  DANIEL C. SCHWARTZ, ESQ.
17                                CAITLIN DOWNS, ESQ.
                                  BRYAN CAVE LLP
18                                1155 F Street, NW, Suite 500
                                  Washington, DC 20004
19                                (202) 508-6000
                                  caitlin.downs@bryancave.com
20
                                  DYLAN REINGOLD, ESQ.
21                                INDIAN RIVER COUNTY
                                  ATTORNEY'S OFFICE
22                                1801 27th Street
                                  Vero Beach, FL 32960-3365
23                                (772) 226-1424
          (Continued on Next Page)
24
          Proceedings recorded by mechanical stenography; transcript
25        produced by computer-aided transcription
```

```
 1      APPEARANCES (CONTINUED):
 2
        For the Defendant          LUTHER L. HAJEK, ESQ.
 3      Peter M. Rogoff:           U.S. DEPARTMENT OF JUSTICE
                                   Environment and Natural Resources
 4                                 999 18th Street
                                   South Terrace, Suite 370
 5                                 Denver, CO 80202
                                   (303) 844-1376
 6                                 luke.hajek@usdoj.gov

 7                                 ALISON D. GARNER, ESQ.
                                   U.S. DEPARTMENT OF JUSTICE
 8                                 601 D Street, N.W.
                                   Washington, D.C.  20004
 9                                 (202) 514-2855
                                   alison.garner@usdoj.gov
10
        For Martin County:         STEPHEN M. RYAN, ESQ.
11                                 AMANDEEP S. SIDHU, ESQ.
                                   JACOB HOLLINGER, ESQ.
12                                 McDermott, Will & Emery
                                   The McDermott Building
13                                 500 North Capitol Street, NW
                                   Washington, DC 20001
14                                 (202) 756 8000
                                   sryan@mwe.com
15
                                   MICHAEL D. DURHAM, ESQ.
16                                 MARTIN COUNTY ATTORNEY'S OFFICE
                                   2401 SE Monterey Road
17                                 Stuart, FL 34996
                                   (772) 288-5925
18                                 mdurham@martin.fl.us

19      For the Intervenor         EUGENE ERNEST STEARNS, ESQ.
        Defendant:                 STEARNS WEAVER MILLER
20                                 WEISSLER ALHADOFF & SITTERSON
                                   150 West Flagler Street
21                                 Miami, Fl 33130
                                   (305) 789-3200
22                                 estearns@stearnsweaver.com

23                                 CYNTHIA L. TAUB, ESQ.
                                   STEPTOE & JOHNSON, LLP
24                                 1330 Connecticut Avenue, NW
                                   Washington, DC 20036
25                                 (202) 429-8133
                                   ctaub@steptoe.com
```

1

2      Court Reporter:                    Lisa A. Moreira, RDR, CRR
                                          Official Court Reporter
3                                         U.S. Courthouse, Room 6718
                                          333 Constitution Avenue, NW
4                                         Washington, DC  20001
                                          202-354-3187

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                        P R O C E E D I N G S
2              THE COURT:  Okay.  Good afternoon, everyone.
3              IN UNISON:  Good afternoon, Your Honor.
4              THE COURT:  I understand that we have quite a few
5    people on.  The court reporter has your appearances so I'm
6    not going to make you go around the room again, but I'll
7    tell you what, who's going to be speaking on behalf of the
8    various parties?  Let's start with the plaintiff.
9              MR. KARMEL:  Good afternoon, Your Honor.  This is
10   Philip Karmel, and I will be speaking on behalf of the
11   Indian River County plaintiffs.
12             THE COURT:  Okay.
13             MR. RYAN:  Your Honor, Stephen Ryan speaking for
14   the Martin County plaintiffs.
15             THE COURT:  Okay.  How about the defendants?
16             MR. HAJEK:  Good afternoon, Your Honor.  This is
17   Luke Hajek from the U.S. Department of Justice on behalf of
18   the federal defendants.
19             MR. STEARNS:  Your Honor, Gene Stearns on behalf
20   of All Aboard Florida.
21             THE COURT:  Okay.  It sounds like we have the same
22   line-up as from the hearing.  Why don't I just sort of set
23   the stage and then turn it over to you folks to discuss the
24   motions that you've filed.
25             So obviously the case came to me on a complaint
```

1    and a PI motion.  There were no motions to dismiss, and no

2    requests for jurisdictional discovery at the time that PI

3    was filed.  I, of course, denied the PI motion based on the

4    plaintiffs' failure to demonstrate standing, but as the

5    plaintiffs have emphasized, both the redressability and

6    traceability prongs of the standing inquiry turn in this

7    case on a disputed question of fact, which is whether AAF

8    would go forward with Phase II absent the bonds in question.

9    I determined that the plaintiffs had not, at that stage, met

10   their burden to overcome the declaration of Mr. Reininger

11   based on the record that was before me.

12          Now, I limited the opinion to standing in

13   deference to the D.C. Circuit and the Supreme Court's

14   instruction to always resolve constitutional standing before

15   reaching the merits or, in this case, reaching likelihood of

16   success on the merits.  But that approach can obviously lead

17   to inefficiencies, and one of them here is that if I let you

18   all go off and spend a lot of time and money taking

19   jurisdictional discovery and plaintiffs do, in fact,

20   establish standing, I still could decide that the plaintiffs

21   are not likely to succeed on the merits or, in fact, have

22   failed to state a claim because they've not alleged major

23   federal action requiring NEPA review.

24          By no means am I prejudging that issue, but as my

25   questions at the hearing may have indicated, I think the

 1    plaintiffs have an uphill battle on that issue given, first,

 2    the lack of case law holding that indirect tax benefits

 3    constitute or can constitute major federal action, and,

 4    second, even if a tax exemption could be considered major

 5    federal action, the case law on how big the federal benefit

 6    must be compared to the overall size of the project to

 7    constitute major federal action.

 8         Now, of course, you would need me or the

 9    plaintiffs would need me to make that determination in order

10    to get to the Court of Appeals, but in the interest of full

11    disclosure, given, you know, the current posture of the

12    case, I thought it would be helpful to put that on the

13    record.

14         So with that, I have read the materials on

15    jurisdictional discovery.  I have not had a chance to tear

16    into the motions to dismiss, although it seems to me that

17    they -- if we do proceed with jurisdictional discovery, they

18    can be held in abeyance until that process is complete.

19         So why don't we hear from Indian River first with

20    respect to its request for jurisdictional discovery and any

21    other suggestions for how the case should proceed from this

22    point.

23         MR. KARMEL:  Thank you, Your Honor.  Well, the

24    Court has really summarized the situation in a way that I

25    think tees up the issues.  I agree that the basis of the

1    Court's denial of the motion for a preliminary injunction

2    turned on a disputed issue of fact relating to traceability

3    and, even more so, redressability, and it's those issues

4    that are the subject of our request to take jurisdictional

5    discovery.

6              The All Aboard Florida declarant said that

7    notwithstanding the massive benefits associated with the

8    private activity bonds, All Aboard Florida would proceed

9    even without them, and we're trying to take discovery on

10   that issue by better understanding the finances of the

11   project, how profitable the project would be without the

12   private activity bonds and whether the project would be

13   profitable at all, or, even if it would have some positive

14   profits, if it would be insufficiently profitable to warrant

15   the type of massive investment required for this project.

16   So all of our discovery requests are targeted at that set of

17   issues, and we'd like to proceed to try to obtain that

18   information to meet the burden of proof that was outlined in

19   the Court's decision.

20             We also agree with respect to the motions to

21   dismiss; that they should be held in abeyance until we get

22   an opportunity to complete the jurisdictional discovery

23   under any parameters or schedule that the Court establishes

24   in granting our motion.

25             THE COURT:  Okay.  Now, AAF has argued that in the

1    event jurisdictional discovery proceeds, your requests are

2    nonetheless overly broad.

3             Mr. Stearns, do you want to address that?

4             MR. STEARNS:  Yes, Your Honor.  And I would start

5    just with the procedural niceties --

6             THE COURT:  Yes.

7             MR. STEARNS:  -- which is, I would expect it would

8    be a request to produce.  I'd kind of hoped that they would

9    have done that after we filed our pleading because the Rules

10   of Civil Procedure do have a form that we follow, which is

11   they file a request, and we respond; and one of the elements

12   of that would be cooperation back and forth to try to narrow

13   it so we can meet both the short time frame as well as see

14   if we can identify those issues.  And instead, we

15   essentially started with a motion with 20 requests without

16   definitions or instructions, and so I do think they've

17   jumped the gun.

18             If we get to the issue of discovery on the

19   standing, the jurisdictional issues, I think it is useful to

20   just have some broad understanding of where we are.

21             This project is well underway, obviously.  They're

22   building it as we speak, the first phase, which is Miami to

23   Palm Beach.  What exists is a matrix, an Excel spreadsheet,

24   which is maintained continuously.  The latest iteration is

25   dated May 6th, and what that includes is both givens and

1    assumptions.  It started off a while ago with a lot more

2    assumptions than presently exist, and as assumptions turn

3    into hard numbers, then the assumption goes away, and the

4    hard number appears.

5          What you have in that spreadsheet, in that

6    analysis, economic analysis, is what drives the outcome.

7    That is, you can plug in an interest rate, for example, and

8    a time to pay it, and it can calculate at what point, based

9    on other factors that are plugged into the matrix -- at what

10   point the project is slated to become cash flow positive,

11   which is what we saw in a declaration which was filed on the

12   29th, as well as at what point it becomes profitable.

13         And what the business plan shows is if it -- a

14   higher interest rate is obligated or that's their end result

15   of losing the tax-exempt bonds, the time which it goes cash

16   flow positive is delayed, and the time at which it becomes

17   profitable is delayed, in each instance well within the

18   first ten years of the program.  Frankly, much sooner than

19   that.

20         And so what you have is a company that's already

21   invested hundreds of millions to this venture, has committed

22   hundreds of millions more in capital, not to mention that

23   which it would be borrowing from purely private sources, but

24   I would dare say that that information will fairly quickly

25   dispose of any argument.  All Aboard Florida is not going to

1    dispose of the project regardless.

2              We've supplemented that with the -- actually we've

3    indicated that that document exists.  We have supplemented

4    it with two affidavits:  one from Mr. Reininger, but also

5    one from one of the senior people at Fortress, who is

6    directly involved and has been involved in the capital

7    formation plan who obviously, based on his background and

8    experience -- this is what he does, is raise money for

9    ventures such as this.  And he has indicated what the

10   prospects are in the marketplace, which is that it is a

11   virtual certainty that this company will raise the money

12   either in tax-exempt financing or in traditional financing

13   accessing one or more of the many capital markets that exist

14   for a conventional financing, if that's necessary.

15             So we've identified two witnesses for certain, and

16   we've certainly identified the mother lode of factual

17   information, which is the May 6th business plan matrix.

18             THE COURT:  Okay.  So you've identified two

19   issues.  As to the second issue, why shouldn't the

20   plaintiffs have an opportunity to test the declarants that

21   you have put forth to establish that AAF would, in fact, go

22   forward?

23             MR. STEARNS:  I can't -- you know, other than the

24   fact that it's an inconvenience and a bother to take this to

25   an obvious conclusion, I'm not going to argue with the

1    Court.  That's not unreasonable.

2         THE COURT:  Okay.  And the second issue for you,

3    Mr. Karmel, is they argue that it's only the latest

4    iteration of the pro forma that's relevant to AAF's current

5    intent as to whether to go forward or not.  Why do you need

6    all the information going back to, you know, 2014?

7         MR. KARMEL:  Well, I mean, if what Gene suggested

8    is we simply get a spreadsheet and assume that all the

9    numbers on the spreadsheet are accurate, you know, without

10   any ability to look at underlying correspondence and

11   documents, I think it really puts the plaintiffs at an

12   unfair disadvantage.  We're not seeking discovery, you know,

13   back to the dawn of time or anything like that.  We're

14   seeking relevant correspondence and reports and documents

15   that we specifically identified going back to, you know,

16   approximately the time that the application for the private

17   activity bonds were submitted to DOT.

18         The application was submitted to DOT less than a

19   year ago so we've tried to have a targeted request.  If we

20   simply get a spreadsheet, it's going to have a series of

21   numbers in it, and we'll have no ability to identify the

22   source of those numbers, the reasonableness of those

23   numbers, whether the numbers bear any close resemblance to

24   the presumably similar spreadsheet that existed at the time

25   that the bond application was submitted less than a year ago

1    and really discover the truth.  And that's what we're trying

2    to get at.

3          Now, in terms of the complaint that I haven't

4    served discovery requests, if the Court thinks that's the

5    appropriate procedure, obviously the plaintiffs will do

6    that.  I didn't want to serve discovery requests without any

7    permission from the Court because it would be premature.

8          THE COURT:  Okay.

9          MR. KARMEL:  But if the Court would establish

10   procedure requiring that requests be served, obviously we'll

11   comply with that.

12         THE COURT:  Regardless of the format, I do think

13   it's important that you folks first try to get together and

14   see if you all can narrow some of the requests, and let's

15   figure out what we're really fighting over, and I suppose a

16   request under the rules is the best way to do that.

17         I guess related to that issue is what is the

18   current timing?  And is there -- given the extension that I

19   understand was granted by the government for authorizing the

20   PABs, are we under any current timing pressure?

21         MR. STEARNS:  Your Honor, I can speak to that.

22         THE COURT:  Okay.

23         MR. STEARNS:  Obviously time is critical because

24   there is a window now to sell the bonds.  And you can read

25   about Greece.  You can read about Puerto Rico.  Fortunately

1   those issues have probably been helpful in this environment

2   because they have given investors the quality, and U.S.

3   bonds are considered high.

4           So that hasn't hurt us from the standpoint of

5   interest rate or whatever, but the markets are very helpful.

6   There is a desire to sell.  I think we're looking at

7   marketing bonds prior to the end of July.  We're working

8   with -- the plaintiffs on the one hand are saying that the

9   state process is just a slam dunk, and then on the other

10  they've got lawyers here working night and day to try to

11  delay it and get a negative outcome.  That goes to the issue

12  of obviously traceability, which is a different issue.

13          As a practical matter, we don't have a hearing

14  date set, but we're anticipating -- nor do we have the

15  FEIS done yet.  We're anticipating those shortly, but to

16  have a -- I would say -- I think I can say fairly we're

17  anticipating being able to market the tax-exempt bonds

18  before the end of July.

19          THE COURT:  Okay.

20          MR. STEARNS:  If I may, Your Honor, just in terms

21  of the -- just the broad issue of discovery, the business

22  plan is going to show basically the cost of construction,

23  and those variables may become fixed.  For example, the cost

24  of building a station, once a contract is signed, that goes

25  from an assumption to a fixed number.  The ridership study,

1    which we have now produced, is the biggest driver of cash

2    flow and income, and that obviously was just completed and

3    made available to the plaintiffs, and you can see that in

4    the matrix.  That's going to be the major assumption in

5    terms of revenue.  And then the interest cost is simply

6    plugging in numbers and then applying those variables.

7            And what you're going to see, by looking at the

8    spreadsheet, is the assumptions are all identified.  As in

9    any spreadsheet, you start off with the facts you know, and

10   then you go to the assumptions, but it's not that

11   complicated.

12           I mean, obviously the project is $2.5 billion so

13   it's not insubstantial, and all the details that go in it

14   are substantial, but it's not that difficult for people that

15   are knowledgeable about such things to see fairly quickly

16   where this is going.

17           THE COURT:  Okay.  Well, be that as it may, I do

18   think Mr. Karmel is correct that at least some context for

19   those projections in the form of, you know, correspondence

20   and obviously deposition testimony is in order.  I mean, you

21   know, it doesn't do him much good just to get the latest

22   version of a spreadsheet.

23           Okay.  Well, why don't -- we'll issue an order

24   reflecting a schedule for a request for production of

25   documents, and you all narrow the issues, and to the extent

1    there are still disagreements as to the scope of the

2    requests, let us know, and we can do another call.  Okay?

3             MR. STEARNS:  Your Honor, there's one thing of

4    significance I do want to raise, if I may.  This is Gene

5    Stearns.  This information -- this is a bond market, and

6    we're in a very highly politicized environment here in

7    Florida.  The Indian River people, you know, have obviously

8    motivated county governments to bring these lawsuits.

9             THE COURT:  I believe someone is breathing into

10   the phone.  If you all could not do that.  I know these are

11   exciting issues.

12            MR. STEARNS:  Your Honor, I think the issue is

13   going to be a standard confidentiality order where this

14   information -- this is extremely -- these are business

15   records that are very, very confidential.  The bond

16   markets -- you know, people are making business decisions,

17   and I think the number of people who have access to this

18   information we would be producing these to be limited, and

19   security needs to be established, I believe.  Otherwise,

20   mischief will be done.

21            THE COURT:  Well, I'm confident that Mr. Karmel

22   and Mr. Ryan can accommodate those concerns.

23            MR. KARMEL:  Yes.  We can enter into a protective

24   order of -- typical to these types of cases.  I indicated

25   that in my papers.  So, Mr. Stearns, I'm still working on

1    the discovery requests because I suspect that's what I'm

2    going to be told to do, so why don't you send me the

3    protective order in the form that you would prefer, and I'll

4    take a look at it.

5            MR. RYAN:  This is Steve Ryan for Martin County.

6    Can I just address a couple of issues?

7            THE COURT:  I was going to get to your request

8    separately.

9            MR. RYAN:  Okay.

10           THE COURT:  But to the extent you want to weigh in

11    on these issues, feel free.

12           MR. RYAN:  Thanks, sir.

13           I just was going to try to make it easier on all

14    of us.  The GAO has a usual model we use with protests that

15    we, it would seem to me, would be very amenable with.

16    Steptoe and Mr. Stearns and myself and Mr. Karmel could all

17    model off of the GAO protective order for this kind of a

18    case.  The bid protests area generates all of this exchange

19    of information, and to the extent we just use that existing

20    model, I think that might be very helpful for all parties

21    just because we can just pull it off the shelf.

22           And then I'll come back and address my other

23    issues when the Court has a minute.

24           THE COURT:  I will leave the form of the

25    protective order and confidentiality order to you folks to

1    decide.  Okay?

2          The Government, if I recall correctly, did not

3    oppose Indian River's requests for discovery; is that

4    correct?

5          MR. HAJEK:  We would defer to AAF's position on

6    that.  We agree with their position.

7          THE COURT:  Okay.

8          Okay.  Mr. Ryan, Martin County.

9          MR. RYAN:  Yes, sir.  I just wanted to indicate,

10    first of all, that we join in the jurisdictional discovery

11    requests, Martin County.  We didn't plague the Court with

12    additional briefing on it, but that is as much ours as

13    Mr. Karmel's in that sense.

14          THE COURT:  Okay.

15          MR. RYAN:  And I want to emphasize, for example,

16    in Paragraph 20 of Mr. Karmel's request there is a very

17    simple category of documents, which is the communications

18    that AAF has made with Congress.  We'd like to see those as

19    well as the financial documents because we think those

20    communications may lay great emphasis on the necessity of

21    the app.

22          So there are minor categories there.  I just want

23    to emphasize that we'll try to work it out.  We'll get back

24    with you if people are going to say that's not going to be a

25    possibility, but we'll leave it to that discussion.

 1          The second point that I wanted to raise with you

 2     is we had put in very limited discovery on the merits on the

 3     Title 23 issue, specifically poking at the defendants' claim

 4     that it spent money on the project, which we believe

 5     actually is not true and that they've only spent it on the

 6     rail corridor.  And we gave a very limited set of discovery

 7     on that, and, you know, I understand that that's --

 8          THE COURT:  But it's also -- isn't it also purely

 9     a legal question?  I mean, isn't there a threshold legal

10     question as to whether funding for the corridor, so to

11     speak, qualifies under the statute, even if you're correct?

12          MR. RYAN:  That's correct.

13          THE COURT:  Okay.

14          MR. RYAN:  But I guess it would be important for

15     the Court to know what is a fact.  In other words, is there

16     any money that's been spent on the AAF project?  Is it

17     solely on the corridor?

18          If they want to do that as an admission, we could

19     perhaps get rid of all of the discovery; that none of it has

20     been spent on the AAF project, and it's been done that way.

21     But I would like some guidance from the Court on how to

22     handle that issue.  You know, perhaps the Department of

23     Transportation and Department of Justice can agree that

24     they'll stipulate to that effect so that they can make their

25     legal argument.

1          THE COURT:  Mr. Hajek?

2          MR. HAJEK:  Yes, Your Honor.  Good afternoon.

3          THE COURT:  Good afternoon.

4          MR. HAJEK:  So I guess I would make three points.

5     One Mr. Ryan has already gone over.  This is not a request

6     for jurisdictional discovery.  It relates to a merits

7     question that they have argued in the PI phase.  Standing is

8     a jurisdictional question that's before the Court, and this

9     Court may never get beyond standing so it may never be

10    necessary to reach this merits issue.

11         The second, and I think most important, is that

12    this is an APA case.  It should be resolved based on the

13    agency's record, and plaintiffs have not even tried to meet

14    their burden of showing that there's been some bad faith on

15    the part of the Government or that the record is so bare

16    that it would prevent judicial review.  Now, of course, the

17    record hasn't been filed yet so that's another reason that

18    the Court could deny the motion as premature.

19         The third --

20         THE COURT:  On that point, will the plaintiffs be

21    opposing the Government's motion to dispense at this stage

22    with the filing of the record?

23         MR. KARMEL:  Yes, sir.

24         THE COURT:  Okay.  Mr. Hajek?

25         MR. HAJEK:  Is there a follow-up question about

1    the record then?

2            THE COURT:  No.  I understand your argument.

3            MR. HAJEK:  Okay.

4            So I think there's a fundamental reason the motion

5    should be denied, and that is that this is an APA case, and

6    they haven't tried to show bad faith.

7            But also, as the Court kind of hinted at, the

8    discovery that Martin County seeks is not necessary at all

9    for the resolution of the case.  It relies on this

10   distinction, which isn't in the statute, between funds that

11   are spent for the project corridor versus the project, and

12   the Court can resolve that as a legal issue.  And if the

13   case were to go to the merits and the parties were to cite

14   portions of the record that they felt were appropriate on

15   this issue, if the Court still felt that this factual issue

16   were important, the appropriate thing to do -- for the Court

17   to do would be to remand it to the agency and not to allow

18   discovery.  So that's not a reason to grant their discovery

19   requests.

20           THE COURT:  Okay.  Mr. Ryan, one last bite?

21           MR. RYAN:  I'll just say I didn't hear any promise

22   that this would be in the administrative record if one was

23   ordered to be put forward.  If it were, then I would be

24   willing to defer the discovery request, this part of the

25   discovery request, if it was going to be in the

1    administrative record.

2         What I've heard is "I don't want to give an

3    administrative record"; therefore, I can't get it that way.

4    That's why we've asked for it in discovery.  I've asked even

5    to take a stipulation.  I haven't heard any of that, and at

6    the end of the day doesn't the Court want to know that

7    there's some basis for the Government's theory?

8         And candidly, I don't believe a word of the

9    Government's theory on this, and I tried to show why that

10   was the case during the PI, which the Court hasn't expressed

11   itself about.

12        THE COURT:  Well, it seems to me that the

13   threshold question is whether anything turns on this

14   question, and if the Government is correct, that the statute

15   permits authorization upon or based on funding of the

16   corridor apart from funding of the specific project, then

17   nothing turns on the distinction.

18        Now, I haven't -- I'm not prejudging that legal

19   question, but it seems to me there is a threshold legal

20   question to be determined.

21        MR. RYAN:  There's a threshold fact issue.  If the

22   Government is going to concede that none of the money was

23   spent on the AAF project, that's fine.  I think that's what

24   I'm driving at.  As long as they're willing to stipulate

25   that all the money was spent on the corridor but not on the

 1    AAF project, that's fine.

 2             MR. HAJEK:  And, Your Honor -- this is Luke

 3    Hajek -- it's just the way the plaintiff is framing its

 4    argument.  We're not conceding at all that Section 130 funds

 5    weren't spent for the project.  They were spent for railways

 6    and highway crossings along the project corridor.  I don't

 7    think there's going to be any factual dispute about that

 8    being the case.

 9             In our view, that is funding for the project.  In

10    the plaintiffs' view, it is not.  And so I think it is

11    largely a legal question.

12             THE COURT:  Okay.

13             Okay.  Anything else while we're here?

14             MR. RYAN:  Your Honor, one last item for Martin

15    County.  I just wanted to raise that there's a separate

16    lawsuit, FOIA lawsuit, that was filed on June 19th.  The

17    Government's response is due on July 25th.  I was interested

18    in you asking or perhaps accepting the idea that we have an

19    early status conference in that case.

20             And the reason is that the Government has

21    indicated that it collected all of the documents which had

22    been FOIA'd about the PAB issue, and that those documents

23    were ready for discussion in May.  Since those may overlap

24    with jurisdictional discovery that we've put in, and we're

25    entitled to it under the FOIA -- not Martin County, but CARE

1    that has filed that lawsuit -- it may be an easy way to

2    solve some of these problems and get a few more facts on the

3    table.  So if you could take a look at that?  We did file it

4    as a related case, and it has come to you, is my

5    understanding.

6         THE COURT:  Okay.  I will do that.  And you

7    anticipate the discovery will overlap because some of the

8    documents in the Government's possession originated with

9    AAF?  Is that the idea?

10         MR. RYAN:  It's both that they originated with AAF

11    or were communications within the Department of

12    Transportation about the documents from AAF, and both would

13    be related.

14         But the important point is if they're all

15    collected, and they haven't been produced to us, it seems --

16    they were supposed to have been produced in May, the first

17    batch of documents.  So on a rolling basis, what I'd like to

18    do at the status conference is get an answer from the

19    Government of what they have in the volume that's ready to

20    be turned over, and to turn over as much of that material as

21    possible given that it was a January FOIA, and it does

22    overlap the discovery that Mr. Karmel and I have put in.

23         THE COURT:  Okay.  We'll take a look at that.

24         I take it, Mr. Hajek, you're not involved in the

25    defense of that FOIA case, correct?

1      MR. HAJEK:  That's correct.  I've been trying to

2  figure out who the agency person would be, but I have not.

3           THE COURT:  Okay.

4      MR. RYAN:  Thank you, Your Honor.  Nothing else.

5           THE COURT:  Okay.  Anyone else?

6      MR. HAJEK:  Not from the Government, Your Honor.

7           THE COURT:  Okay.  Well, you all have at least

8  some of your marching orders, and we will get out a minute

9  order that may have a few more specifics, but I think we see

10  the path forward.  Okay?

11          MR. STEARNS:  Thank you, Your Honor.

12          MR. RYAN:  Thanks, sir.

13              (Whereupon the hearing was

14              concluded at 2:37 p.m.)

15  **CERTIFICATE OF OFFICIAL COURT REPORTER**

16          I, LISA A. MOREIRA, RDR, CRR, do hereby certify

17  that the above and foregoing constitutes a true and accurate

18  transcript of my stenographic notes and is a full, true and

19  complete transcript of the proceedings to the best of my

20  ability.

21      Dated this 20th day of July, 2015.

22

23                          /s/Lisa A. Moreira, RDR, CRR
                            Official Court Reporter
24                          United States Courthouse
                            Room 6718
25                          333 Constitution Avenue, NW
                            Washington, DC 20001